**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEBBIE F.S.,[1] | ) Case No. CV 19-8768-JPR |
| Plaintiff, | ) |
| | ) MEMORANDUM DECISION AND ORDER |
| v. | ) AFFIRMING COMMISSIONER |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Submission, filed August 5, 2020, which the Court has taken under submission

---

[1] Plaintiff's name is partially redacted in line with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

without oral argument.  For the reasons stated below, the
Commissioner's decision is affirmed.

**II.   BACKGROUND**

Plaintiff was born in 1959.  (Administrative Record ("AR")
113, 293.)  She completed 12th grade and worked as an assistant
in an optometry office and laboratory and as a recreation aide
for Long Beach Unified School District.  (AR 333.)  On January
31, 2017, she applied for SSI, alleging disability since December
1, 2008, because of varicose veins.[1]  (AR 113, 332.)  After her
application and reconsideration of it were denied (AR 113-23,
125-36), she requested a hearing before an Administrative Law
Judge (AR 155-56).  A hearing was held on May 8, 2019, at which
Plaintiff, represented by counsel, testified, as did a vocational
expert.  (AR 74-95.)  In a written decision issued May 30, 2019,
the ALJ found her not disabled.  (AR 20-34.)  On August 13, 2019,
the Appeals Council denied her request for review.  (AR 6-8.)
This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the

---

[1] Plaintiff apparently had filed four previous applications
for SSI, in 1992, 1997, 2004 (concurrent applications for SSI and
DIB), and 2010.  (See AR 101, 104, 272-74, 281-89.)  All were
denied except the 2010 application, as to which the ALJ found her
disabled and "entitled to benefits for Medicare purposes only"
beginning December 1, 2008, through March 31, 2014, as a Medicare
Qualified Government Employee.  (AR 112; see AR 101, 110-11,
281); 42 C.F.R. § 406.15 (defining MQGEs).  To make that
determination, the ALJ found that Plaintiff had demonstrated
eligibility under the five-step sequential evaluation for
determining disability.  (See AR 101-12); Padlo v. Berryhill, No.
2:15-cv-1953-AD, 2017 WL 735734, at *3 n.4 (E.D. Cal. Feb. 24,
2017) (applying five-step sequential evaluation to MQGE
application).

Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is "more than a mere scintilla but less than a preponderance." Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

1   1992).

2       A.    The Five-Step Evaluation Process

3       An ALJ follows a five-step sequential evaluation process to

4   assess whether someone is disabled.  20 C.F.R. § 416.920(a)(4);

5   Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as

6   amended Apr. 9, 1996).  In the first step, the Commissioner must

7   determine whether the claimant is currently engaged in

8   substantial gainful activity; if so, the claimant is not disabled

9   and the claim must be denied.  § 416.920(a)(4)(i).

10      If the claimant is not engaged in substantial gainful

11  activity, the second step requires the Commissioner to determine

12  whether the claimant has a "severe" impairment or combination of

13  impairments significantly limiting her ability to do basic work

14  activities; if not, a finding of not disabled is made and the

15  claim must be denied.  § 416.920(a)(4)(ii) & (c).

16      If the claimant has a "severe" impairment or combination of

17  impairments, the third step requires the Commissioner to

18  determine whether the impairment or combination of impairments

19  meets or equals an impairment in the Listing of Impairments

20  ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix

21  1; if so, disability is conclusively presumed and benefits are

22  awarded.  § 416.920(a)(4)(iii) & (d).

23      Before proceeding to step four, the ALJ must determine the

24  claimant's residual functional capacity ("RFC").[2]  § 416.920(e);

25  see also Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir.

26

27      [2] RFC is what a claimant can do despite existing exertional
    and nonexertional limitations.  § 416.945(a)(1); see Cooper v.
28  Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

2017) (ALJ assesses claimant's RFC between steps three and four). The fourth step requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. § 416.920(a)(4)(iv).  If it is not or the claimant has no past relevant work, the Commissioner then bears the burden of establishing that she is not disabled because she can perform other substantial gainful work in the national economy, the fifth and final step of the analysis.  §§ 416.920(a)(4)(v), 416.960(c)(2); Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 31, 2017, the application date.  (AR 22.)  At step two, she determined that she had the severe impairments of "recurrent varicose veins bilateral lower extremity; and status post venous stripping surgery." (Id.)  At step three, she concluded that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 24-25.)  At step four, she found that Plaintiff had the RFC

to perform medium work as defined in 20 CFR 416.967(c) except she can lift and carry 50 pounds occasionally and 25 pounds frequently; stand and walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; frequently kneel; and occasionally crouch.

(AR 25.)  The ALJ found that Plaintiff had no past relevant work and continued to step five.  (AR 28.)

At that step, considering Plaintiff's age, education, work experience, and RFC and the VE's testimony, she found that Plaintiff could perform several jobs existing in significant

1 numbers in the national economy.  (AR 28-29.)  Accordingly, she

2 found her not disabled.  (AR 29.)

3 **V.   DISCUSSION**

4      Plaintiff asserts that the ALJ didn't properly consider her

5 subjective symptom evidence; the opinions of the state-agency

6 reviewers and consulting examiner, who found her limited to light

7 work; or her need to frequently change position.  (J. Stip. at 2-

8 3, 3-15, 20-25, 25-27, 30-31, 31-34, 34-38, 38-41.)  She also

9 claims that a newly submitted medical-source opinion from a

10 treating physician supports remand.  (Id. at 34.)  For the

11 reasons discussed below, the ALJ did not err.

12      A.   The ALJ Gave Clear and Convincing Reasons to Partially

13           Discount Plaintiff's Subjective Symptom Statements

14           1.   Relevant background

15                a.  *Plaintiff's treating doctors*

16      Plaintiff had an ultrasound on June 25, 2014; it reflected a

17 history of right-greater-saphenous-vein stripping in 2001.[3]  (AR

18 399-401.)  There was "no evidence of deep venous thrombosis,"[4]

19

---

20      [3] The great saphenous vein runs from the ankle to the groin,
delivering blood from the ankle, lower leg, and thigh to the

21 femoral vein and containing one-way valves that prevent the blood
from flowing backward to the foot; if malfunctioning, the valves

22 can cause varicose veins.  Great saphenous vein, Healthline,
https://www.healthline.com/human-body-maps/great-saphenous-vein#1

23 (last visited Mar. 8, 2021).  "The great saphenous vein is
sometimes stripped out of the leg to eliminate varicose veins."

24 (Id.)

25

26      [4] Deep vein thrombosis, or DVT, occurs when a blood clot, or
thrombus, forms in one of the deep veins of the body, usually in

27 the legs.  Deep Vein Thrombosis (DVT), Mayo Clinic, https://
www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/

28                                        (continued...)

and the deep-posterior-tibial and peroneal veins were "unremarkable."  (AR 399.)  "[I]ncompetent" veins included two "perforator" veins and a "small saphenous" vein, and there was "a thrombosed varicose vein versus a collateral" "5 cm" from "the saphenofemoral junction."[5]  (AR 401.)

Family-medicine doctor Kailash R. Dhamija screened Plaintiff on July 27, 2017.  (AR 415-16.)  After an exam, he noted "normal" "constitutional," cardiovascular, musculoskeletal, and "extremities" findings and assessed her with "[a]symptomatic varicose veins of unspecified lower extremity."  (AR 416-17.)  On

_____

[4] (...continued)
symptoms-causes/syc-20352557 (last visited Mar. 8, 2021).

[5] Incompetent or insufficient veins have trouble sending blood back to the heart; when chronic, vein walls are weakened and valves are damaged, causing blood to pool in the veins, especially when standing.  Venous Insufficiency, MedlinePlus, https://medlineplus.gov/ency/article/000203.htm (last visited Mar. 8, 2021).

Perforator veins communicate between superficial and deep veins by penetrating anatomic layers of the deep fascia.  Perforator Vein, ScienceDirect, https://www.sciencedirect.com/topics/medicine-and-dentistry/perforator-vein# (last visited Mar. 8, 2021).  "Communicating veins, such as intersaphenous veins, connect veins within the same anatomic layer."  Id.

The saphenofemoral junction is the intersection of saphenous and femoral veins near the groin.  Saphenofemoral Junction, Med. Dictionary, https://medical-dictionary.thefreedictionary.com/saphenofemoral+junction (last visited Mar. 8, 2021).

Researchers believe that the presence of superficial venous thrombosis within three centimeters of the saphenofemoral junction is associated with an increased risk of recurrent blood clots in the veins.  Guidelines for Superficial Venous Thrombosis, SciELO, https://www.scielo.br/scielo.php?pid=S1677-54492019000102001&script=sci_arttext&tlng=en#B003 (last visited Mar. 8, 2021).

August 14, 2017, she complained to Dr. Dhamija of "pain" in "both legs" for "10 years." (AR 419.)  The history of Plaintiff's "present illness" was noted as "bilateral leg pain secondary to varicose veins - not stable on current care," and the doctor described her as "normal" in all categories except "[e]xtremities," as to which the only notation was that she was "[w]earing compression stockings." (Id.)  He referred her to a vascular surgeon.  (AR 420.)

On September 21, 2017, vascular surgeon Joseph F. Vardayo[6] examined Plaintiff for "painful varicosities lower extremities." (AR 426.)  She complained of "pain and discomfort" despite "using stockings" and described "pain walking and standing." (Id.)  His examination found "enlarged veins at the right thigh" and the "left," "with involvement all the way down to the knee level." (Id.)  Dr. Vardayo scheduled an ultrasound and recommended stockings, "which the patient already ha[d]." (Id.)

An October 18, 2017 ultrasound found Plaintiff's "lower extremity veins" "unremarkable with respect to appearance, compressibility, and spectral waveform"[7] and revealed "no

---

[6] The ALJ refers to vascular surgeon Ankur Gupta as Plaintiff's treating physician (see AR 26), but the records reflect that his practice partner, Dr. Vardayo, treated her (see AR 422, 424, 426-28, 431-32 (containing handwritten initials that appear to be "J F V")).  This apparent error is of no consequence to the outcome.

[7] Because veins typically are highly compressible, ultrasounds in which the veins are not compressible almost always indicate deep vein thrombosis.  How Deep Vein Thrombosis is Diagnosed, verywellhealth, https://www.verywellhealth.com/deep-vein-thrombosis-diagnosis-1746132 (last visited Mar. 8, 2021).

(continued...)

1   evidence of DVT."  (AR 428.)  The right and left greater-
2   saphenous veins were "[s]tripped/surgically absent" at the
3   "[p]roximal [t]high," "[m]id [t]high," knee, calf, and ankle.
4   (Id.)

5       Dr. Vardayo reviewed the ultrasound report and noted the
6   "presence of the reflux[8] on both sides and specifically on right
7   side," with "significant reflux at the saphenofemoral junction
8   with enlargement of the greater saphenous proximally but also
9   common femoral vein 5 second reflux, left leg slightly better."[9]
10  (AR 427.)  But "considering the patient already ha[d] stripping
11  done," he would schedule "no further surgery."  (Id.)  Instead,
12  he recommended that she "proceed with using the stockings for
13  . . . support" and see him as needed.  (Id.)

14                  b.   *State-agency doctors*
15      On April 24, 2017, internist Rocely Ella-Tamayo performed a

16

17  ────────────────

18      [7] (...continued)
    Spectral waveforms measure blood-flow patterns and reflect
19  the physiologic status of the organs they supply.  Normal Doppler
    Spectral Waveforms of Major Pediatric Vessels: Specific Patterns,
    RadioGraphics, https://pubs.rsna.org/doi/full/10.1148/
20  rg.283075095 (last visited Mar. 8, 2021).

21      [8] In venous reflux, valves don't function adequately,
22  causing blood to reverse flow during standing or sitting.
    Chronic Venous Insufficiency, U.C.S.F. Dep't. of Surgery,
23  https://surgery.ucsf.edu/conditions-procedures/
    chronic-venous-insufficiency.aspx (last visited Mar. 8, 2021).
24

25      [9] A reflux time of over 0.5 seconds for superficial veins
    and over 1.0 seconds for deep veins indicates the presence of
26  reflux, with a longer duration implying more disease; it does
    not, however, "correlate well with clinical manifestations."
27  Chronic Venous Insufficiency, Circulation, https://
    www.ahajournals.org/doi/10.1161/CIRCULATIONAHA.113.006898 (last
28  visited Mar. 8, 2021).

"complete internal medicine evaluation" of Plaintiff but had "no medical records available for review."  (AR 406; see AR 407-10.) Plaintiff complained of "[v]aricose veins" and "[p]ainful joints" and reported varicose-vein stripping "on both lower extremities up to the thighs in 1990 and again in 1997."  (AR 406-07.)  She had gradually developed lower-back and left-knee pain since 1988, experienced "pain with prolonged walking or standing," wore "high compression stockings," and took "pain medication with little help."  (AR 407.)  Her daily activities included "driv[ing] locally," "tak[ing] care of her own needs," "feed[ing] the dog," and "sometimes" going to "the store or doctor."  (Id.)  Her examination was unremarkable, with "[t]ortuous varicose veins[10] on both lower extremities from the legs up to the thighs on removal of her compression stockings" but "[n]o hyperpigmentation or edema."  (AR 408-09.)  Dr. Ella-Tamayo's functional assessment was as follows:

> [T]he claimant is restricted in pushing, pulling, lifting, and carrying to about 20 pounds occasionally and about 10 pounds frequently. Sitting is unrestricted.  In terms of standing and walking, the claimant is able to stand and walk 6 hours out of an 8-hour workday with normal breaks.   She can kneel frequently, squat occasionally.   There is no significant functional

---

[10] Tortuous varicose veins are twisted, widened veins in the subcutaneous tissues of the legs and are often easily visible "but are widely seen as medically unimportant and deserving low priority for treatment."  Varicose Veins and Their Management, U.S. Nat'l Libr. of Med., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1526945/ (last visited Mar. 8, 2021).

1      impairment observed on both hands.  There are no visual,

2      communicative or environmental limitations.

3  (AR 410.)

4      Dr. D. Pong[11] reviewed Plaintiff's records on June 27, 2017,

5  noting that she had a "[s]evere" impairment of "[v]aricose

6  [v]eins of [l]ower [e]xtremities," with pain, loss of sensation,

7  and weakness.  (AR 118-21.)  The doctor noted that she could

8  "occasionally" lift and carry 20 pounds, "frequently" lift and

9  carry 10 pounds, stand or walk and sit "[a]bout 6 hours [each] in

10  an 8-hour workday," and was "[u]nlimited" in her ability to push

11  and pull.  (AR 120.)  Dr. Pong found that Plaintiff's gait was

12  normal; she had "[b]ack pain" with range of motion; her

13  "[s]ensory" impressions were within normal limits; and her

14  strength was "5/5 throughout."  (Id.)  Dr. Pong found that the

15  "MSS[12] is too restrictive[;] light RFC is more appropriate."[13]

16  ────────────────

17     [11] There is no indication in the record of Dr. Pong's area
of specialization.

18
19     [12] "MSS" presumably refers to Dr. Ella-Tamayo's medical-
source statement.  (See AR 406 ("Internal Medicine Evaluation").)

20     [13] Dr. Pong had been directed as follows:

21      Per review of clmt's IMCE report, recommend a Med RFC.
22      Minimal to mild abn finding.  Please advise if the
    suggestive [sic] MSS from IMCE is overly restricted.

23
24  (AR 118.)  "IMCE" presumably means internal-medicine consultative
examiner, referring to Dr. Ella-Tamayo, whose report suggested
25  limitations consistent with a light range of work.  (See AR 410.)
Thus, Dr. Pong's response that "[b]ased on PE, MSS is too
26  restrictive" (AR 120) would seem to suggest that a medium RFC –
not "light" as he stated – was what he intended as "more
27  appropriate" (see id.).  Indeed, the prompt to Dr. Pong had
"recommend[ed] a Med RFC" and asked him to confirm.  (AR 118.)
28                                        (continued...)

1  (Id.)

2      On November 28, 2017, Dr. H. Jone[14] reviewed Plaintiff's

3  medical records, finding the same impairments and limitations as

4  Dr. Pong and parroting the exertional-limitation finding, stating

5  that "[b]ased on PE, MSS is too restrictive, light RFC is more

6  appropriate."  (AR 133; see also AR 131-36.)

7                    c.  *Plaintiff's statements*

8      On March 15, 2011, Plaintiff testified that she had worked

9  part time until mid-June 2009.[15]  (AR 37, 42-43.)  She explained

10  that even though she worked for six months after her December 1,

11  2008 alleged onset date, her legs "really bothered [her] a lot,"

12  and she was "doing the best [she] could at that time."  (AR 44-

13  45.)  Her duties were not reduced and she didn't miss work, but

14  because she couldn't sit to elevate her legs, they would "swell

15  up and start throbbing."  (AR 45.)  She reported no change in her

16  legs after she stopped working – they "still bother[ed her] a

17  lot."  (AR 46.)

18      She wore compression stockings daily; otherwise, she

19  couldn't "walk around [her] house" and was "[u]nable to do

20  anything."  (Id.)  With the compression stockings, she could

21

22      [13] (...continued)

23  But in fact, Dr. Pong's RFC was almost identical to Dr. Ella-

    Tamayo's except that she found that Plaintiff could "frequently"

24  kneel and Dr. Pong limited her to "occasional" posturals, making

    Dr. Pong's assessment arguably more restrictive, not less.

25  (See AR 120, 410.)

26

      [14] Dr. Jone's specialty is not indicated in the record.

27

      [15] This testimony was given for her 2010 MQGE application

28  but concerns symptoms within the relevant period here.

                              12

stand for 15 to 30 minutes at a time and walk for "30 minutes to an hour." (AR 46-47.) She could sit for "[t]wo hours, three hours" and lift and carry between 15 and 20 pounds. (AR 47-48.)

Her treatment at the time was compression stockings, Motrin, and leg elevation. (AR 50-51.) After vein-stripping surgery of both legs in 1992, she experienced "a lot of trouble" and didn't want another. (AR 48, 58.) She had "some improvement" but then varicose veins returned and her feet became "real bad and [she] couldn't even wear shoes." (AR 58.) Dr. Dhamija offered a referral for another surgery, but she didn't ever see the specialist because she was "afraid" given that the last surgery "laid [her] up." (AR 50.)

During the daytime she "s[a]t in the recliner and put [her] legs] up." (AR 51.) She hadn't looked for a sedentary job because she didn't have "qualifications for a lot of them." (Id.) At home, she did laundry and dishes and watched her two dogs, was able to perform self-care, helped with cooking and chores, and drove a car to do errands. (AR 52-54.)

In an exertion questionnaire dated March 17, 2017, Plaintiff described "lower back pain [and] all over leg pain" that prevented her from carrying out a normal workday. (AR 338.) She could walk "maybe a block or 2" (see id.), didn't climb stairs, and "couldn't" and "didn't" lift things (see AR 339). She nonetheless did her own grocery shopping but no chores, and she wore "30 to 40 [millimeters of mercury] compression" "medical support stockings." (AR 340.)

On April 14, 2017, Plaintiff completed another exertion questionnaire, in which she described her symptoms as "fatigue,

leg pain, . . . shortness of breath (when it's too much for me) up and down both legs, get a lot of pain in my feet - burning ac[h]ing (when too much walking)." (AR 354; see AR 356.) She stated, "can't walk to [sic] far of long distance [sic], cause my legs start hurting real bad soon after!" (AR 354 (emphasis in original).) She had to buy her compression stockings "out of pocket, cause the[y were] not covered by medical insur[ance]" and cost "about $75" a pair. (AR 356.)

At the hearing on May 8, 2019, Plaintiff testified that she drove a car to "do errands" "two or three" times a week. (AR 78.) She wore support stockings "[e]very day" because she needed "them to help with pain with [her] legs." (Id.) On a typical day, she woke up "between 9:30 and 10:30," took care of her "small dog," took "a couple of Aleve's with [her] coffee" and "Ibuprofen's [in the] afternoon" because "they're stronger," and "stay[ed] around the home most of the time," "watching TV and stuff." (AR 79-80.) She couldn't "do a whole lot" because she felt "a lot of pain in [her] ankles and [her] feet." (AR 79.)

She could not "stand or walk for a total of six hours in an eight-hour day." (AR 83.) The longest she spent on her feet was "two, three hours," with a maximum of "15 minutes, 20 minutes" at a time. (AR 84.) She would experience "numbness" and "swelling" if she stood any longer than that. (Id.) She elevated her legs for "30, 45 minutes" "three to five times" a day. (AR 85.) She had two surgeries "[a]bout 12 years ago maybe," but at the time of the hearing her varicose veins were "[i]noperable." (AR 88.)

d.   *The ALJ's decision*

After noting that Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms," the ALJ found that her statements about their intensity, persistence, and limiting effects were "inconsistent with the record because while [her] record [wa]s significant for venous stripping surgeries in her lower extremities, the subsequent treatment history [wa]s fairly minimal other than the recommendation for use of compression stockings." (AR 26.)  She cited the 2014 ultrasound finding "no evidence" of deep vein thrombosis as well as "generally unremarkable" examination findings in response to Plaintiff's "intermittent" complaints of pain in her legs.  (Id.)  She also noted the vascular surgeon's September 2017 generally normal findings and "no history of stasis ulcer and claudication."[16]  (Id.)  Treatment was compression stockings.  (Id.)  An October 2017 ultrasound revealed "reflux at the . . . saphenofemoral area, but the dee[p] system was intact" and there was "no evidence of deep vein thrombosis on either extremity."  (Id.)  At her November 2017 follow-up appointment, the doctor recommended "to continue with the use of compression stockings, with no further surgery being scheduled," and instructed that she should be seen "on an as-needed basis."  (Id.)  The ALJ remarked that there were no other

---

[16] Venous ulcers are open skin sores caused by circulation problems in the legs.  Venous Ulcers, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/venous-ulcers (last visited Mar. 8, 2021).

Claudication is pain in the thigh, calf, or buttocks that occurs during walking and is caused by narrowed or blocked arteries that reduce blood flow to the legs.  Claudication, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/claudication (last visited Mar. 8, 2021).

treatment notes in Plaintiff's record. (Id.)

Referring to Dr. Ella-Tamayo's consultative examination, the ALJ noted Plaintiff's grip strength of "40, 40, 40 pounds" on both sides; "no hyperpigmentation or edema"; "normal" gait and joints of the lower extremities, with "no inflammation or tenderness"; range of motion "within normal limits"; normal "deep tendon reflexes" "of the upper and lower extremities"; and motor strength "5/5 symmetrically." (Id.) The ALJ gave "partial weight to [Dr. Ella-Tamayo's] opinion to the extent that the stand and walk limitation of 6 hours, the frequent kneeling and occasional squatting [were] consistent with the objective finding of enlarged veins on thighs bilaterally," but she found "the light exertional limitation [wa]s not consistent with the objective findings in the record that were generally unremarkable and within normal limits and not consistent with the conservative course of treatment essentially consisting of wearing compression stockings." (AR 27.)

She also found that Plaintiff's "activities of daily living were inconsistent" with her "statements concerning the alleged intensity, persistence, and limiting effects" of her symptoms. (Id.) In support, she cited Plaintiff's ability to "take care of her own needs, feed her dog, . . . go to the store and the doctor," and drive two to three times a week "to stores and running errands," demonstrating "physical and mental abilities" that were "the same as those necessary for obtaining and maintaining employment." (Id.)

Further, she found "the degree of [Plaintiff's] subjective complaints . . . not comparable to the frequency or extent of

16

treatment sought." (Id.)  Plaintiff's treatment regimen was "conservative," and the "record [wa]s devoid of evidence of persistent attempts to obtain relief [of] symptoms, such as trying a variety of treatments or changing treatment sources." (Id.)  Instead, her treatment was "essentially routine and conservative in nature, involving nothing more than over-the-counter medication and compression stockings." (Id.)

Finally, "no restrictions [were] recommended by treating physicians." (Id.)  Given Plaintiff's allegation of disabling symptoms, the ALJ suggested that "one might expect to see some indication in the treatment records of restrictions placed on [her] by a treating doctor." (Id.)

### 2. Applicable law

An ALJ's assessment of a claimant's allegations concerning the severity of her symptoms is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended) (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment

17

[that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036 (citation omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Id. (citation omitted & emphasis in original).

If the claimant meets the first test, the ALJ may discount the claimant's subjective symptom testimony only if she makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014).  The ALJ may consider, among other factors, the claimant's (1) reputation for truthfulness, prior inconsistent statements, and other testimony that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) daily activities; (4) work record; and (5) physicians' and third parties' statements. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the ALJ's evaluation of a plaintiff's alleged symptoms is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

18

1          3.   Analysis

2          The ALJ found that Plaintiff's "statements concerning the

3     intensity, persistence and limiting effects of [her] symptoms

4     [we]re not entirely consistent with the medical evidence and

5     other evidence in the record."  (AR 26.)  She provided two

6     additional clear and convincing reasons supported by substantial

7     evidence for partially discounting Plaintiff's subjective symptom

8     statements: her statements were inconsistent with the "frequency

9     or extent of treatment sought" and with the "restrictions

10    recommended by treating physicians."  (AR 27.)  Any error in the

11    ALJ's remaining reason – that her "activities of daily living

12    were inconsistent with [her] statements concerning the alleged

13    intensity, persistence, and limiting effects of symptoms" (id.) –

14    was harmless.

15              a.   *Objective Medical Evidence*

16         The ALJ's first reason for discounting Plaintiff's

17    subjective complaints was that they were inconsistent with the

18    objective medical evidence (AR 26), which is a "sufficient basis"

19    for rejecting a claimant's subjective symptom testimony.

20    Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th

21    Cir. 2008) (citation omitted); see also Morgan v. Comm'r of Soc.

22    Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (finding

23    "conflict" with "objective medical evidence in the record" to be

24    "specific and substantial" reason undermining plaintiff's

25    statements).  Specifically, the ALJ noted "no evidence of deep

26    venous thrombosis," "intermittent" complaints of "pain in her

27    legs" in 2016 and 2017, "generally unremarkable" examination

28    findings, "fairly minimal" "subsequent treatment history" other

19

than "compression stockings" after "venous stripping surgeries in her lower extremities,"[17] and referral to a vascular surgeon, who recommended that she "continue with the use of compression stockings, with no further surgery being scheduled," and be seen "on an as-needed basis."  (AR 26.)

Plaintiff's ultrasounds from 2014 and 2017 showed right-side incompetent perforator veins and reflux (see AR 401, 428-29) but no deep vein thrombosis (see AR 399, 401, 428, 429).  They also showed "complete compressibility," "phasicity and augmentation,"[18] and "unremarkable" veins in the calf.  (AR 399.)  Indeed, the 2017 ultrasound found the "lower extremity veins" "unremarkable with respect to appearance, compressibility, and spectral waveform," the "deep femoral vein" "unremarkable in appearance," and the "paired posterior tibial and peroneal veins in the calf" "unremarkable."  (AR 428; see also AR 26 (ALJ noting that "the dee[p] system was intact," with "no evidence of deep venous thrombosis on either extremity")).

---

[17] It's not clear exactly when Plaintiff had her surgeries (see AR 399 (2014 ultrasound report noting "[h]istory of stripping [of the] right greater saphenous vein" in 2001), 407 (consultative examiner reporting surgeries in 1990 and 1997 in patient history gained from interview of Plaintiff); but see AR 86, 88 (Plaintiff testifying that she had surgery in 1995 and about 12 years before the 2019 hearing)), but they were well before the December 1, 2008 onset date alleged here.

[18] Phasicity is respiratory blood-flow change with breathing, the absence of which may mean a blood clot.  Bedside Ultrasound, Ultrasound DVT, https://cmijournal.wordpress.com/2016/04/27/ultrasound-dvt/ (last visited Mar. 8, 2021).

Augmentation is a diagnostic test in which the muscles are gently squeezed, which should cause a surge in blood flow in the vein; if it doesn't, a clot may be present.  Id.

Moreover, as the ALJ observed, Plaintiff only "intermittently complained of pain in her legs . . . in 2016 and 2017." (AR 26.) For example, Dr. Dhamija noted at a July 27, 2017 office visit that Plaintiff's varicose veins were "[a]symptomatic." (AR 417.) But on August 14, 2017, Plaintiff complained of "pain" in "both legs" for "10 years" and requested a referral to the "same surgeon" she had seen three years before to "discuss surgery options." (AR 419.) Dr. Dhamija referred her but recommended only that she continue taking ibuprofen and return to him or an emergency room if her symptoms worsened, and there is no evidence of either happening. (AR 420.) The foregoing reports of only intermittent complaints of pain, no deep vein thrombosis, and numerous "unremarkable" findings provided the ALJ substantial evidence to partially discount Plaintiff's statements. See Roberts v. Berryhill, 734 F. App'x 489, 491 (9th Cir. 2018) (finding that ALJ properly discounted claimant testimony based on intermittent doctor visits that didn't support testimony of debilitating pain and fatigue).

Further, the ALJ explained that examination by the vascular surgeon found the presence of enlarged veins bilaterally, but Plaintiff was "alert and oriented, her heart had regular rate and rhythm, and in her lower arterial system, all the pulses were present and palpable"; she had "no history of stasis ulcer and claudication"; and the surgeon recommended that she continue the "use of compression stockings, with no further surgery being scheduled, and . . . be seen on an as-needed basis." (AR 26; see also AR 426, 431.) She also noted that consultative-examiner Ella-Tamayo diagnosed "tortuous varicose veins," but her physical

examination found "grip strength of 40, 40, 40 pounds on the right
and . . . left"; "normal" gait, range of motion, deep tendon
reflexes of the upper and lower extremities, and joints of the
lower extremities; "no inflammation or tenderness"; "no calf
tenderness or pedal edema"; and "motor strength [of] 5/5
symmetrically."  (AR 26; <u>see also</u> AR 406-10.)  The ALJ properly
considered the foregoing medical evidence a "relevant factor in
determining the severity of [Plaintiff's] pain and its disabling
effects."  <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001)
(holding that lack of corroboration with medical evidence can't be
sole reason to reject subjective pain testimony but is relevant to
determining severity and disabling effects of pain).

                    b.  *Conservative Treatment*

        Second, the ALJ concluded that "the degree of [Plaintiff's]
subjective complaints [was] not comparable to the frequency or
extent of treatment sought," her "treatment regimen was
conservative[,] and the case [wa]s devoid of evidence of
persistent attempts to obtain relief [of] symptoms such as trying
a variety of treatments or changing treatment sources."  (AR 27.)
A conservative course of treatment may undermine a claimant's
allegations of disabling symptoms.  <u>See, e.g.</u>, <u>Parra</u>, 481 F.3d at
750-51 (stating that "[e]vidence of 'conservative treatment' is
sufficient to discount a claimant's testimony regarding severity
of an impairment" (citation omitted)).  None of Plaintiff's
treating doctors recommended "more than over-the-counter
medication and compression stockings."  (<u>See</u> AR 27 (citing AR 404,
419-20, 427).)

        Plaintiff argues that her two prior surgeries demonstrate

                                   22

aggressive treatment, and that because she "was afraid to have
more surgery, could not afford surgery, and more importantly that
she was advised that no further surgery was possible," her
testimony should not be discounted because nothing more could
have been done.  (J. Stip. at 10; see id. at 8-11, 18-20.)  She
is correct that her surgeries were not conservative treatment,
see Michel v. Berryhill, No. EDCV-17-01793-AFM, 2018 WL 3031450,
at *4 (C.D. Cal. June 15, 2018) (collecting cases finding surgery
not conservative treatment), but those surgeries were performed
well before her alleged onset date, and she worked for at least
one year, and up to 11 years, after them.  (See AR 42 ("I worked
up until June '09."); see also AR 88 (last surgery "about" 2007),
399 (surgery in 2001), 407 (surgeries in 1990 and 1997).)  In
2017, after examining Plaintiff and reviewing her then-recent
ultrasound, vascular surgeon Vardayo recommended no further
surgery because her veins already had been stripped, but he also
did not suggest any other aggressive treatment, only that she
continue to wear compression stockings.[19]  (See AR 431.)  Thus,
during the relevant time period, she had no surgery, and none of
her treating doctors found deep vein thrombosis, edema, ulcers,
or any other diagnosis warranting more than conservative
treatment with compression stockings and over-the-counter — not
prescription — pain relievers.  (See AR 415-32); Craig v.

---

[19] Contrary to Plaintiff's contention (J. Stip. at 22
(citing Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294,
1297 (9th Cir. 1999))), the ALJ was not required to address why
Plaintiff didn't seek more aggressive treatment because she
relied on Dr. Vardayo's and the other doctors' failure to find
that any such treatment was needed.

23

1  Berryhill, No. 2:17-CV-02978-GMN-EJY, 2019 WL 4936033, at *14 (D.

2  Nev. Sept. 17, 2019) (finding medication, nightly leg elevation,

3  compression stockings, and use of diuretics "conservative

4  treatment"), accepted by 2019 WL 4932922 (D. Nev. Oct. 7, 2020);

5  see also Parra, 418 F.3d at 750-51 (treatment with over-the-

6  counter pain medication is "conservative treatment" sufficient to

7  discredit claimant's testimony regarding allegedly disabling

8  pain).

9           c.   *Restrictions Not Recommended*

10      The ALJ also discounted Plaintiff's testimony because given

11  her "allegations of disabling symptoms, one might expect to see

12  some indication in the treatment records of restrictions placed

13  on [her] by a treating doctor."  (AR 27.)  An absence of

14  functional limitations was substantial evidence supporting the

15  ALJ's discounting of Plaintiff's claims of disabling impairment.

16  See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993)

17  (finding that substantial evidence supported ALJ's finding of no

18  disability because "[n]one of the doctors who examined [the

19  claimant] expressed the opinion that he was totally disabled");

20  see also Roberta W. v. Comm'r of Soc. Sec., No. C19-5464-BAT,

21  2019 WL 5456194, at *2 (W.D. Wash. Oct. 24, 2019) (finding that

22  ALJ permissibly rejected claimant's testimony because although

23  compression stockings were required, no doctor limited her

24  activities in manner she claimed), appeal filed, No. 19-36032

25  (9th Cir. Dec. 9, 2019).  Plaintiff contends that the ALJ should

26  have considered Dr. Bambrah-Dhamija's "November 2010 check off

27  disability form" concluding that she was "non-functional."  (J.

28  Stip. at 14; see also AR 106 (ALJ discussing form in 2011

24

1  decision).)  But those records also include treatment notes from
2  Dr. Bambrah-Dhamija reflecting mostly "within normal limits"
3  examination findings and "moderate pain control" with compression
4  stockings, along with a consultative-examination finding that
5  Plaintiff was able to perform activities consistent with medium
6  work.  (See AR 106-07.)  Thus, aside from an unsupported checkoff
7  form, those records appear to further support the ALJ's
8  discounting of her symptom testimony.

9              d.  *Daily Activities*

10        Finally, the ALJ also partially rejected Plaintiff's
11 subjective symptom statements based on evidence that she could
12 "take care of her own needs, feed her dog, and go to the store
13 and the doctor."  (AR 27.)  An ALJ may discount a claimant's
14 subjective symptom testimony when it is inconsistent with her
15 daily activities.  See Molina, 674 F.3d at 1113.  "Even where
16 those [daily] activities suggest some difficulty functioning,
17 they may be grounds for discrediting the claimant's testimony to
18 the extent that they contradict claims of a totally debilitating
19 impairment."  Id.  The ALJ here found that "[s]ome of the
20 physical and mental abilities required in order to perform the
21 [described] activities are the same as those necessary for
22 obtaining and maintaining employment."  (AR 27.)  But this
23 finding might have been unsupported because self-care, dog
24 feeding, and running errands two or three times a week do not
25 necessarily translate to an ability to perform a medium range of
26 work.  See Fair, 885 F.2d at 603 (holding that "many home
27 activities are not easily transferable to what may be the more
28 grueling environment of the workplace, where it might be

1  impossible to periodically rest or take medication").

2      Even assuming the ALJ erred, any error was harmless because

3  the ALJ provided three clear and convincing reasons for partially

4  rejecting Plaintiff's testimony — inconsistency with the medical

5  record, conservative treatment, and no doctor-recommended

6  functional limitations.  See Larkins v. Colvin, 674 F. App'x 632,

7  633 (9th Cir. 2017) ("[B]ecause the ALJ gave specific, clear and

8  convincing reasons for finding [plaintiff] not fully credible,

9  any error in the additional reasons the ALJ provided for finding

10 [her] not fully credible was harmless." (citing Batson v. Comm'r

11 of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004))).

12     Remand is not warranted.

13     B.   The ALJ Properly Discounted the State-Agency Opinions

14          as Inconsistent with the Objective Medical Evidence

15     Plaintiff asserts that the ALJ improperly rejected the

16 opinions of Drs. Pong and Jone because they were "highly

17 qualified to ascertain limitations" and the ALJ was "not

18 qualified to provide a medical opinion."  (J. Stip. at 26.)

19 Next, Plaintiff contends that the ALJ's reasons for "rejecting"

20 Dr. Ella-Tamayo's light-RFC opinion were contradicted by the

21 state-agency physicians and the medical evidence.  (Id. at 31-

22 33.)  These arguments do not require remand.

23     1.   ALJ Decision

24     The ALJ gave "little weight to the opinions of the State

25 agency medical consultants," who concluded that Plaintiff should

26 be limited to "light work, with occasional postural limitations."

27 (AR 27.)  She found those opinions "inconsistent with the

28 objective findings in the record as a whole, including generally

unremarkable findings, minimal and conservative treatments, and [Plaintiff's] activities of daily living." (Id.)  The ALJ gave "partial weight" to Dr. Ella-Tamayo's opinion

> to the extent that the stand and walk limitation of 6 hours, the frequent kneeling and occasional squatting limitation are consistent with the objective finding of enlarged veins on thighs bilaterally . . . , but the light exertional limitation is not consistent with the objective findings in the record that were generally unremarkable and within normal limits and not consistent with the conservative course of treatment essentially consisting of wearing compression stockings.

(Id.)  In her explanation of why Dr. Ella-Tamayo's light-work RFC was not supported, the ALJ cited the doctor's examination findings showing Plaintiff's "40, 40, 40" grip strength on both sides; her lack of "hyperpigmentation or edema"; her "normal" gait, "joints of the lower extremities," "range of motion," and "deep tendon reflexes of the upper and lower extremities"; her lack of "inflammation or tenderness" in the lower extremities or "calf tenderness or pedal edema"; and her "motor strength [of] 5/5 symmetrically."  (AR 26 (citing AR 406-10).)

## 2. Applicable Law

Three types of physicians may offer opinions in Social Security cases: those who directly treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither.  Lester, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally

entitled to more weight than a nonexamining physician's.  Id.; see § 416.927(c)(2).[20]  But "the findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (per curiam) (as amended).

The ALJ may disregard a physician's opinion regardless of whether it is contradicted.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see Carmickle, 533 F.3d at 1164.  When a doctor's opinion is not contradicted by other medical-opinion evidence, however, it may be rejected only for a "clear and convincing" reason.  Magallanes, 881 F.2d at 751; Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ must provide only a "specific and legitimate reason" for discounting it.  Carmickle, 533 F.3d at 1164 (citing Lester, 81 F.3d at 830-31).  The weight given a physician's opinion, moreover, depends on whether it is consistent with the record and accompanied by adequate explanation, among other things.  § 416.927(f)(1).  The ALJ

---

[20] For claims filed on or after March 27, 2017, the rules in § 416.920c (not § 416.927) apply.  See § 416.920c (evaluating opinion evidence for claims filed on or after Mar. 27, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."  § 416.920c(a).  Thus, the new regulations eliminate the term "treating source" as well as what is customarily known as the treating-source or treating-physician rule.  See § 416.920c.  Plaintiff's claim was filed before March 27, 2017, and the Court therefore analyzes it under the treating-source rule in § 416.927.

1  considers findings by state-agency medical consultants and
2  experts as opinion evidence.  § 416.927(e).

3      Further, "[t]he ALJ need not accept the opinion of any
4  physician . . . if that opinion is brief, conclusory, and
5  inadequately supported by clinical findings."  Thomas, 278 F.3d
6  at 957; accord Batson, 359 F.3d at 1195.  An ALJ need not recite
7  "magic words" to reject a physician's opinion or a portion of it;
8  the court may draw "specific and legitimate inferences" from the
9  ALJ's opinion.  Magallanes, 881 F.2d at 755.

10     The Court must consider the ALJ's decision in the context of
11 "the entire record as a whole," and if the "'evidence is
12 susceptible to more than one rational interpretation,' the ALJ's
13 decision should be upheld."  Ryan v. Comm'r of Soc. Sec., 528
14 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

15          3.  Analysis

16     The ALJ noted that the state-agency reviewing physicians'
17 opinions were inadequately supported by the objective medical
18 evidence, citing the "generally unremarkable" "examination
19 findings," "intermittent[] complain[ts] of pain in her legs," "no
20 evidence of deep venous thrombosis," "regular" heart rate and
21 rhythm, "no history of stasis ulcer and claudication," and
22 treatment with only ibuprofen and compression stockings.  (AR 26;
23 see also AR 399, 409-10, 416-20, 426, 428-29.)  These reasons
24 alone were a proper basis to discount the state-agency opinions.
25 See Thomas, 278 F.3d at 957.  Further, consultative-examiner Dr.
26 Aziz Karamlou's determination after examining Plaintiff in June
27 2011 (for her 2010 application but during the time period
28 relevant here) that she had the RFC to "lift and carry 25 pounds

29

frequently and 50 pounds occasionally, stand and/or walk 6/8 hours, sit 6/8 hours" (AR 107) was consistent with the medium-work RFC found by the ALJ.  <u>See</u> § 416.967(c); <u>Ryan</u>, 528 F.3d at 1198 (finding that Court must consider "record as a whole").  Thus, the ALJ's rejection of the "light work" findings by Drs. Pong and Jone was supported by substantial evidence.

As to Dr. Ella-Tamayo, as an initial matter, the ALJ did not "reject" her opinion.  She gave it "partial weight" and in fact adopted all of the doctor's functional limitations except lifting and carrying 20 pounds occasionally and 10 pounds frequently.  (<u>Compare</u> AR 25, <u>with</u> AR 410.)  The ALJ's citation to the doctor's own examination findings and her reliance on the "generally unremarkable and within normal limits" (AR 27) findings in the other medical evidence provided specific clear-and-convincing reasons on which to discount those portions of her opinion.  <u>Magallanes</u>, 881 F.2d at 751; <u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31).  Although Plaintiff complains that the ALJ was "not qualified to provide a medical opinion" and no other doctor found the limitations in the ALJ's RFC (J. Stip. at 32), in fact Dr. Karamlou's opinion supported the lifting and carrying limitations the ALJ found, and those were the only functional assessments of Dr. Ella-Tamayo's the ALJ didn't follow.

Accordingly, remand is not warranted because the ALJ properly evaluated the state-agency doctors' opinions.

C.   <u>The New Evidence Does Not Support Remand</u>

Plaintiff has submitted a functional assessment dated December 11, 2019 — a half-year after the ALJ's decision and

after the Appeals Council denied review — from family-medicine doctor Mehtab Bambrah-Dhamija and argues that it supports remand. (J. Stip. at 34-36 & Ex. A.)  As discussed below, it does not.

### 1.   The new evidence

The assessment states that Plaintiff can lift and carry "10 pounds," sit three hours at a time and five hours in an eight-hour workday, stand and walk half an hour at a time and three hours in an eight-hour workday, needs unscheduled 10- to 15-minute breaks two or three times a day, and requires leg elevation to hip level 50 percent of an eight-hour workday.  (J. Stip., Ex. A.)  These limitations were "based on [the doctor's] objective findings" that Plaintiff had "[p]ain in bilateral lower extremity [that] flare[d] up 2-4 times [a] week."  (Id.)  There is no indication that Dr. Bambrah-Dhamija had examined Plaintiff recently or of the exact nature of any treating relationship.

### 2.   Applicable law

In determining whether to remand a case "in light of new evidence," "the court examines both whether the new evidence is material to a disability determination and whether a claimant has shown good cause for having failed to present the new evidence to the ALJ earlier." Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001) (as amended).

To be "material," the new evidence "must bear 'directly and substantially on the matter in dispute.'"  Id. (quoting Ward v. Schweiker, 686 F.2d 762, 764 (9th Cir. 1982)); see also Skuja v. Colvin, 671 F. App'x 463, 464 (9th Cir. 2016) (new evidence is not material when it "fails to relate back" to relevant period). The plaintiff must also show a "reasonable possibility" that the

1  new evidence "would have changed the outcome." <u>Mayes</u>, 276 F.3d

2  at 462 (citing <u>Booz v. Sec'y of Health & Human Servs.</u>, 734 F.2d

3  1378, 1380-81 (9th Cir. 1984)).

4      To show "good cause," the plaintiff must demonstrate that

5  the new evidence was "unavailable earlier." <u>Mayes</u>, 276 F.3d at

6  463.  New evidence that "surfaces after the Secretary's final

7  decision" that could not have been obtained "at the time of the

8  administrative proceeding" satisfies the good-cause requirement.

9  <u>Key v. Heckler</u>, 754 F.2d 1545, 1551 (9th Cir. 1985).

10          3.  <u>Analysis</u>

11      Dr. Bambrah-Dhamija's 2019 evaluation is not material

12  because it does not bear directly on the matter in dispute,

13  namely, the nature and extent of Plaintiff's physical impairments

14  during the relevant period.  <u>Mayes</u>, 276 F.3d at 462.  The

15  assessment is dated December 11, 2019, and appears to state her

16  capabilities more than a half-year after the hearing in this

17  case.  Plaintiff contends that Dr. Bambrah-Dhamija gave a similar

18  opinion in 2011 and that even though the new opinion is dated a

19  half-year after the ALJ's decision, it is based on conditions

20  that have always been present.  (J. Stip. at 34.)  But nothing in

21  the assessment indicates that it is restrospective, and the two

22  opinions are nearly a decade apart.

23      Further, Plaintiff has not demonstrated good cause for not

24  submitting it earlier.  She offers no explanation for why she

25  didn't obtain Dr. Bambrah-Dhamija's opinion before the Appeals

26  Council ruled, much less the ALJ.  <u>See Mayes</u>, 276 F.3d at 463;

27  <u>see also Lopez v. Saul</u>, No. 1:19-cv-00971-BAM, 2020 WL 6526197,

28  at *8 n.5 (E.D. Cal. Nov. 5, 2020) (declining to consider new

1  evidence because plaintiff didn't make requisite showing that it

2  couldn't have been incorporated into administrative record).

3  She contends that because the report is dated after the ALJ's

4  decision it necessarily wasn't available earlier. (J. Stip. at

5  35.)  But "[a] claimant does not meet the good cause requirement

6  by merely obtaining a more favorable report once his or her claim

7  has been denied." <u>Mayes</u>, 276 F.3d at 463.

8      Accordingly, the new evidence does not warrant remand.

9      D.   <u>The ALJ Properly Considered Plaintiff's Need to Change</u>

10          <u>Position</u>

11     Finally, Plaintiff contends that the ALJ "fails to address

12  or consider the prior finding of a frequent need to change

13  position." (J. Stip. at 38-39.)  She argues that the ALJ should

14  have applied a "presum[ption]" that the limitation "continue[s]

15  to exist." (J. Stip. at 39.)

16     Even if such a presumption would normally apply, it has no

17  bearing here.  Specifically, in 2011, the ALJ found that

18  Plaintiff had varicose veins and a severe back-pain impairment

19  (<u>see</u> AR 110), but her current impairments do not include back

20  pain (<u>see</u> AR 23 ("There is no objective medical evidence that

21  documents this [back pain] diagnosis resulted from anatomical,

22  physiological, or psychological abnormalities that are

23  demonstrable by medically acceptable clinical or laboratory

24  diagnostic techniques.")), a finding Plaintiff has not challenged

25  on appeal.  Thus, the changed circumstance of an absent

26  impairment rebuts any presumption.  <u>See</u> <u>Stubbs-Danielson v.</u>

27  <u>Astrue</u>, 539 F.3d 1169, 1173 (9th Cir. 2008) (finding that medical

28  evaluations completed after initial final denial necessarily

provided new, material information not reviewed by first ALJ, thus constituting changed circumstance rebutting prior finding); Johnson v. Berryhill, No. 16-cv-01332-JCS, 2017 WL 3670025, at *16 (N.D. Cal. Aug. 24, 2017) (finding that new information presented to second judge rebutted res judicata effect applicable to "a previous ALJ's findings concerning residual functional capacity, education, and work experience" (citing Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988))).

Moreover, medical evidence submitted with the current application contradicts the allegation of a need to change position frequently.  Despite assessing a light-work limitation, Dr. Ella-Tamayo found that "[s]itting is unrestricted."  (AR 410.)  And in 2011, Plaintiff testified that during the daytime she "usually" sits "and stay[s] somewhere for six hours without having to get up and walk around."  (AR 51; but see AR 64 (responding "[n]o" to counsel's question of whether she could sit for more than four hours).)  In 2019, she testified that on a typical day when she had nowhere to go, she spent "two, three hours" standing or walking and elevated her legs "throughout the day" (AR 84-85), suggesting that she sat most of the time.  Thus, the record evidence does not appear to support a need to change position.

Remand is not warranted.

**VI.   CONCLUSION**

Consistent with the foregoing and pursuant to sentence four

of 42 U.S.C. § 405(g),[21] IT IS ORDERED that judgment be entered
DENYING Plaintiff's request for remand, AFFIRMING the
Commissioner's decision, and DISMISSING this action with
prejudice.

DATED: _____March 11, 2021_____     _____
                                              JEAN ROSENBLUTH
                                              U.S. Magistrate Judge

---

[21] This sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."